UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Jeffrey S. Brown**

    **v.**

Case No. 12-CV-234-PB
Opinion No. 2013 DNH 090

**Carolyn W. Colvin, Acting Commissioner,**
**Social Security Administration**

**MEMORANDUM AND ORDER**

Jeffrey Brown seeks judicial review of a decision by the Commissioner of the Social Security Administration ("SSA") denying his application for disability insurance benefits. Brown argues that I should either reverse the Commissioner's decision or remand the case for further proceedings because the Administrative Law Judge ("ALJ") failed to properly evaluate the medical evidence. For the reasons provided below, I remand the case for further administrative proceedings.

## I.  BACKGROUND[1]

### A.    Procedural History

Brown was born on March 16, 1960. He completed the eighth grade. Brown's past work experience consists of positions as a

---

[1] The background information is taken from the parties' Joint Statement of Material Facts (Doc. No. 20) and summarized here. Citations to the Administrative Transcript are indicated by "Tr."

1

landscape laborer, commercial driver, furniture mover, and highway maintenance worker.  On October 13, 2010, Brown applied for disability insurance benefits and alleged a disability onset date of September 22, 2009, due to a variety of physical problems including: burns on his right arm, lung problems, gout, high blood pressure, lower back problems, high cholesterol, sleep apnea, and asthma.

The SSA denied Brown's application for benefits on January 14, 2011.  Following denial, Brown requested a hearing before an ALJ, which occurred on October 3, 2011.  Brown was represented by counsel and testified at the hearing.  The ALJ issued a decision denying Brown's request for benefits on October 24, 2011.  Brown appealed to the Appeals Council of the Office of Disability Adjudication and Review, which denied his appeal on June 5, 2012.

**B.    <u>Relevant Medical Evidence</u>**

Brown sought medical treatment for a variety of ailments beginning in 2004.  He visited doctors regarding burns he suffered on eighty-seven percent of his body following a house fire in 1995; obesity and related health problems; hypertension; bronchitis; chronic obstructive pulmonary disease; sleep apnea; gout; and problems with various joints and limbs.

### 1.  Dr. Ajay Sharma: Treatment History and Medical Source Statement

#### a.  Treatment history

Dr. Ajay Sharma treated Brown on several occasions in 2010.[2]  See Tr. 298, 301, 304, 307, 313, 316, 359, 362.  Dr. Sharma treated Brown for hypertension, obesity, hyperlipidemia, lower back pain, gout, right degenerative hip disease, and carpal tunnel syndrome. Id.

On March 1, 2010, Dr. Sharma conducted a routine follow-up examination after Brown's February 12, 2010, emergency room visit for hypertension.  Id. at 316.  Dr. Sharma diagnosed Brown with hypertension and prescribed hydrochlorothiazide ("HCTZ") and Lisinopril.  Id. at 318.  On March 16, 2010, Dr. Sharma noted that Brown's hypertension had improved with the medication.  Id. at 314.

On July 7, 2010, Dr. Sharma noted that Brown experienced some tenderness over his paraspinal muscles in the lumbar region.  Id. at 304.  Brown rated his pain as a seven out of ten.  Id.  Dr. Sharma prescribed Tylenol with codeine to treat his pain.  Id. at 305.

---

[2] Specifically, Dr. Sharma treated Brown March 1, 2010; March 16, 2010; May 21, 2010; July 7, 2010; September 24, 2010; October 5, 2010; November 16, 2010; and December 22, 2010.

Dr. Sharma again treated Brown for back pain on September 24, 2010.  Tr. 301.  Brown rated his pain as an eight out of ten.  Id.  Dr. Sharma again prescribed Tylenol with codeine for the pain.  Id. at 303. Dr. Sharma also noted that Brown had left base metatarsal tenderness.  Id. at 302.  Dr. Sharma diagnosed Brown with gout and prescribed Colchicine.  Id.  Dr. Sharma prescribed Allopurinol in addition to Colchicine for Brown's gout on October 5, 2010.  Id. at 299.  Brown rated his pain as an eight out of ten that day.  Id. at 298.

Brown complained to Dr. Sharma of right hip pain during a routine follow-up appointment for hypertension on May 21, 2010. Id. at 307.  Brown rated his pain as a seven out of ten.  Id. Dr. Sharma prescribed Tylenol with codeine.  Id. at 308.

During another follow-up appointment for hypertension on November 16, 2010, Brown again complained of hip pain and rated the pain as an eight out of ten.  Id. at 362.  Dr. Sharma ordered X-rays of Brown's hip.  Id. at 363.  The X-rays showed moderate to severe osteoarthritic degenerative changes but no evidence of dislocation or fracture.  Id. at 365.  There were mild bone attachment changes in the region of the femur to hip joint.  Id.  The X-rays also revealed degenerative spurring at

4

the pubic symphysis.[3]  Id.  On December 22, 2010, Dr. Sharma
referred Brown to an orthopedic doctor, Dr. Weintraub, and
prescribed Vicodin for degenerative hip disease of the right
hip.

On November 16, 2010, Brown complained to Dr. Sharma that
he had been experiencing left thumb numbness for six months to
one year.  Tr. 362.  Dr. Sharma referred Brown to Dr. Tatiana
Nabioullina of Foundation Neurology for nerve conduction studies
of Brown's left hand.  Id. at 364, 366, 367.  The study revealed
electrophysiological evidence of severe median neuropathy[4] in the
left wrist.  Tr. 367.  The study revealed no evidence of
polyneuropathy.[5]  Id.

On December 22, 2010, Dr. Sharma diagnosed Brown with
moderate to severe carpal tunnel syndrome.  Tr. 360.  Dr. Sharma
referred Brown to an orthopedic doctor, recommended wearing a
carpal tunnel brace at night, and prescribed Medrol.  Id.

---

[3] Pubic symphysis is "the firm fibrocartilaginous joint in the
median plane between the two opposing surfaces of the pubic
bones." Stedman's Medical Dictionary 1884 (28th ed. 2006)
[hereinafter Stedman's].

[4] Neuropathy is a "disorder, often toxic, of the neuron."
Stedman's at 1312.

[5] Polyneuropathy is "[a] disease process involving a number of
peripheral nerves." Stedman's at 1536.

b.    Dr. Sharma's Medical Source Statement

On September 21, 2011, Dr. Ajay Sharma completed a medical source statement regarding Brown's ability to perform work-related activities.  Id. at 378-81.  Dr. Sharma opined that Brown could occasionally lift and/or carry ten pounds; frequently lift and/or carry less than ten pounds; and stand and/or walk for less than two hours in an eight-hour workday. He determined that Brown requires a hand-held assistive device (such as a cane) to walk; must periodically alternate between sitting and standing to relieve pain and discomfort; and is limited in his ability to push or pull with his arms and legs. Id. at 378-379.  Dr. Sharma also opined that Brown could never perform postural activities, including climbing, balancing, kneeling, crouching, crawling, or stooping.  Id. at 379.  Dr. Sharma opined that Brown had environmental and manipulative limitations, including reaching, handling, fingering, and feeling.  Id. at 380-381.  Dr. Sharma further opined that Brown could not hold items for long periods of time due to paresthesia[6] and pain in hands.  Id. at 380.  According to Dr. Sharma, Brown

---

[6]  Paresthesia is "[a] spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems."  Stedman's at 1425.

is limited to jobs that permit him to take unscheduled breaks to relieve pain and discomfort. Dr. Sharma opined that Brown was likely to be absent from work three or more times per month and was not capable of gainful employment on a sustained basis.  Id. at 381.

### 2.   **Other Medical Evidence**

#### a.   Treatment by Dr. Monawar

On April 15, 2004, Dr. Monawar treated Brown for a cough and chest pain and diagnosed Brown with Bronchitis.  Tr. 258. Dr. Monawar prescribed an antibiotic.  Id.

On November 4, 2004, Brown complained of a cough during an appointment to monitor his hypertension.  Id. at 268.  Dr. Monawar diagnosed Brown with an upper respiratory tract infection with reactive airway disease and underlying probable allergic rhinitis.  Id.

Brown underwent a sleep study[7] at Southern New Hampshire Sleep Center on September 12, 2004, at the request of Dr. Monawar.  Id. at 259, 266.  On September 28, 2004, Dr. Monawar

---

[7]  A sleep study is used to diagnose sleep disorders. Obstructive sleep apnea is diagnosed by "continuous measurement of airflow, respiratory activity, chin electromyography, ECG, EEG, electrooculogram, and arterial oxygen saturation during sleep." Stedman's at 119.

diagnosed Brown with severe obstructive sleep apnea[8] and restless leg syndrome based on the results of the sleep study.  Id. at 266.  Dr. Monawar noted Brown's crowded pharynx and prescribed a CPAP machine for sleep apnea and Neurotonin for restless leg syndrome.  Id.

On February 16, 2004, Dr. Monawar diagnosed Brown with hypertension and prescribed HCTZ.  Id. at 253.  On April 15, 2004, Dr. Monawar conveyed to Brown the importance of taking HCTZ on a regular basis.  Id. at 258.

On September 28, 2004, and November 4, 2004, Dr. Monawar noted that Brown's hypertension was under control and recommended that he continue his medication.  Id. at 266, 268.

b.   Treatment by Dr. Weintraub

Dr. Weintraub, an orthopedic doctor, treated Brown at the Dartmouth-Hitchcock Clinic on March 31, 2011.  Dr. Weintraub assessed Brown's right hip and left hand.  Id. at 376.  He diagnosed Brown with right hip degenerative joint disease and left severe carpal tunnel syndrome.  Id. at 377.  Dr. Weintraub recommended that Brown undergo left carpal tunnel release

---

[8]  Obstructive sleep apnea is "characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues (soft palate, uvula, and sometimes tonsils), with resultant hypoxemia and chronic lethargy. Stedman's at 119.

surgery.  Id. at 377.  He also recommended a fluoro-guided right hip injection and advised Brown to lose weight because he would probably need a total hip replacement "at some point in the future."  Id.

    c.  Other medical treatment

Brown has been treated for skin grafts and scars due to burns he sustained in a house fire.  Id. at 253, 293, 296, 298, 301, 304, 307, 310, 313, 317, 319, 326, 343, 347, 359, 362.  The record also reflects doctors' repeated observations that Brown is obese and their recommendations that he lose weight.  See id. at 245, 254, 261, 266, 268, 270-71, 293, 298, 314, 326, 356, 360, 377.

On April 11, 2004, Brown sought treatment from Southern New Hampshire Medical Center Emergency Department and received a diagnosis of bronchitis from Dr. David Walker.  Id. at 256.

On July 22, 2004, Physician's Assistant ("PA") Ronald Carson, of Dartmouth-Hitchcock Nashua, treated Brown's hypertension.  Id. at 261.  Brown stated that he had stopped taking his HCTZ.  Id.  Carson prescribed Lisinopril and HCTZ. Id.  Brown also discussed his sleep apnea with Carson.  Id. Brown stated that he snores at night and that it causes choking. Id.  Brown also complained of daytime headaches, excessive daytime sleepiness, and frequent waking during the night.  Id.

Carson reported to Dr. Monawar that Brown was concerned about his sleep apnea.  Id.

On October 29, 2004, Brown visited Dartmouth-Hitchcock Urgent Care complaining of a cough.  He met with Dr. Thyng,[9] who noted that Brown wheezed throughout the examination.  Id. at 267.  Dr. Thyng diagnosed Brown with a viral upper respiratory infection and prescribed Albuterol and Atrovent.  Id.  Brown reported that these medications moderately improved his symptoms when they were administered in the office.  Id.

On April 22, 2005, Brown visited Dartmouth-Hitchcock Clinic for a persistent cough lasting five months.  Id. at 270.  Dr. Burstein ordered a chest X-ray and noted that the cough was likely related to the medication Brown took for his hypertension.  Id.  The chest X-ray revealed evidence of shallow breathing.  Id. at 273.  Dr. Burstein diagnosed Brown with bronchitis and changed his hypertension prescription from Lisinopril to Diovan.  Id. at 271.

On February 4, 2007, Brown sought treatment from St. Joseph's Hospital because he was experiencing right shoulder pain.  Brown was unable to abduct his right shoulder.  Id. at 244-245.  Diagnostic imaging, reviewed by Dr. Jeffrey Chapdelaine, showed extensive calcification consistent with

---

[9]  Dr. Thyng's first name is not in the record.

calcific tendonitis and degenerative changes at the joint
between the clavicle and scapula with no evidence of fracture.
Id. at 249.

A physician at St. Joseph's Hospital[10] diagnosed Brown with
bronchitis on November 11, 2009.  Id. at 285.

On February 12, 2010, Brown visited the emergency room of
Southern New Hampshire Medical Center complaining of
hypertension.  Id. at 296.  Dr. Norman Kossayda noted Brown was
not taking any medications, diagnosed him with hypertension, and
prescribed HCTZ.   Id. at 296-97.

On May 6, 2010, Carol Manning, a registered nurse, treated
Brown for a cough, shortness of breath, and wheezing at Nashua
Area Health Center.  Id. at 310–12.  Brown stated his cough was
constant and that it gave him a headache.  Id. at 310.  He rated
his pain as a seven out of ten.  Id.  Brown was diagnosed with
acute bronchitis.  Id. at 311.  A chest X-ray showed
degenerative spurring of the thoracic spine.  Id. at 325.

On May 11, 2010, Brown sought treatment from Southern New
Hampshire Medical Center for a cough.  Id. at 326.  Chest X-rays
taken for chest pain were normal.  Id. at 328.  Dr. Elizabeth
Karagosian noted that Brown's extensive expiratory wheezes had

---

[10]   The name of the examining physician is unclear from the
record.

significantly improved when he used an Albuterol inhaler during the examination.  Id. at 326–27.  Dr. Karagosian diagnosed Brown with bronchitis with bronchospasms and prescribed Zithromax and Albuterol.  Id. at 327.

On October 22, 2010, Brown sought medical treatment at Foundation Pulmonary from Dr. Joseph Hou.  Id. at 346.  Brown complained of shortness of breath worsened by exertion, occasional chest tightness, and difficulty climbing stairs. Brown indicated that he was experiencing a daily wheeze, which Dr. Hou indicated was "quite apparent" during the examination. Id.  Dr. Hou diagnosed Brown with chronic bronchitis and suspected chronic obstructive pulmonary disease ("COPD") given Brown's symptoms and risk factors.  Id. at 348.  Dr. Hou scheduled a baseline pulmonary function test ("PFT") at Southern New Hampshire Medical Center.  Id.

On November 5, 2010, Dr. Matthew Curley performed the PFT on Brown.  Id. at 356.  Brown's symptoms improved when he used a bronchodilator during the exam.  Id.  Brown's lung volume was normal with the exception of a decreased volume of air expelled after exhalation, which the doctor attributed to obesity.  Id. Dr. Curley diagnosed Brown with a very mild reversible obstructive defect with normal diffusion capacity.  Id.  He

12

opined that asthma or chronic bronchitis may have caused the obstructive defect.  Id.

On November 12, 2010, Dr. Hou diagnosed Brown with COPD and chronic bronchitis.  Id. at 344-345.  He advised Brown that his COPD may improve if Brown used both a bronchodilator and an inhaled corticosteroid.  Id. at 345.

In addition, Kelley Nault, a Single Decision Maker ("SDM") completed a Physical Residual Functional Capacity ("RFC") Assessment based on a review of Brown's medical history up through January 12, 2011.  Id. at 375.  She concluded Brown could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand/and or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and had no limitations in pushing and/or pulling.  Id. at 369.  Because her evaluation was completed on January 12, 2011, she did not consider Brown's treatment for right hip degenerative joint disease and left severe carpal tunnel syndrome which occurred on March 31, 2011. Id. at 377.  Kelley Nault is not a medical professional of any kind.  The ALJ did not address her evaluation and apparently gave no weight to her conclusions.

13

D.    **Administrative Hearing – October 3, 2011**

    **1. Brown's Testimony**

Brown testified at a hearing before the ALJ on October 3, 2011.  Brown stated that he was 51 years old and completed the eighth grade.  Tr. 28-29.  He attempted to get his GED twice, but failed.  Id. at 45.

Brown testified that he had not worked since his alleged disability onset date of September 22, 2009.  Id. at 29.  He further testified that he collected unemployment from September 2009 until June 2010.  Id. at 29-30.

As a highway maintenance worker, he was required to step into and out of trucks, life manhole covers, and walk along the highway, but can no longer perform these job functions because of his respiratory problems.  Id. at 30-31.  He testified that his job in highway maintenance required heavy lifting and walking or standing seven hours a day.  Id. at 31-32.  Brown stated that pain and numbness while sitting make it difficult for him to drive.  Id. at 31.

His main medical problems are chronic obstructive pulmonary disease and chronic bronchitis, which make it difficult for him to breathe.  Id. at 34.  He stated that, especially on hot and humid days, he feels faint and has limited breathing capacity,

takes Albuterol to help him breathe, and suffers from fatigue
and lacks stamina.  Id. at 34, 35, 38.

Brown testified that he has trouble lifting objects such as
a gallon of milk or jug of water because of his ability to grip
and use his hands.  Id. at 34, 45.  Brown gave ambiguous
testimony as to how much weight he is capable of lifting.  He
and the ALJ had the following exchange regarding his weight
lifting ability:

> Q: How much [weight] would you say that you can lift
> frequently?
> A: No more than 10, 15 pounds anymore.
> Q: Okay.
> A: I beat myself up when I was a kid.
> Q: Could you lift 20 pounds occasionally?
> A: No, not really.
> Q: Okay. So 10 to 15 would be the max?
> A: Ten, yeah.

Id. at 36.  Brown testified that he cannot help with household
chores, including washing laundry or doing the dishes, because
he cannot grip or hold items.  Id. at 46.

Brown's lower back numbness affects his ability to sit for
long periods of time.  Id. at 36.  He testified that he can sit
no longer than forty-five minutes to an hour before having to
stand.  Id. at 36-37.  If he sits for longer than an hour, his
right leg goes numb, and he experiences pain in his groin.  Id.
at 46.  After sitting for forty-five minutes to an hour, Brown
needs to move around or stand for thirty to forty-five minutes

15

before he can comfortably sit again.  Id. at 37.  Brown said
that he can stand "no more than an hour, two hours, tops" at one
time.  Id. at 37.

Brown suffers from pain in his hip every day, and, on a
scale of one to ten, he rated his pain as a nine.  Id.  He
treats his pain with Vicodin when he can afford to fill his
prescription.  The medicine brings his pain level to a five on a
scale of one to ten.  Id. at 37–38.  Brown's lower back and
right hip are weak.  Tr. 38-39.  If he gets up suddenly he may
fall to the ground because his right hip "just gives out."  Tr.
39.  Brown has constant throbbing pain in his back, legs, knees,
and hips that sitting or standing for long periods of time
aggravates.  Id.  Brown testified that his doctor recommended a
hip replacement and a carpal tunnel release operation on his
left hand, but that he cannot afford the surgeries because he
lacks insurance.  Id. at 40.  Brown testified that he has
difficulty pushing or pulling with his left hand due to the skin
grafts on that hand.  Id. at 41.

Brown next testified about his daily routine. He described
his typical day as "sitting on the couch, laying down on the
couch, watching TV."  Id. at 42.  His wife and granddaughter
prepare all of his meals.  Id. at 43.  Brown stated that he has
no hobbies, though he "used to be a very active person" with his

16

wife and granddaughter.  Id.  Brown is unable to walk on uneven ground, gravel, or sand and always uses a cane.  Id. at 46.

### 2. Brown's Wife's Testimony

Brown's wife, Robin Brown, also testified at the hearing about her husband's life at home.  Mrs. Brown stated that she does "just about everything" for Brown, including helping him get dressed because of his "really bad hips."  Id. at 50.

She also stated that Brown has trouble sleeping at night and falls asleep during the day.  Id. at 52.  She noted that he has sleep apnea and uses a CPAP machine.  Id.  Mrs. Brown also stated that her husband's sleep apnea had worsened in the last two or three years, and they no longer share a bed because his breathing keeps her awake.  Id. at 54.  Mrs. Brown testified that Brown stays on the couch all day.  Id. at 52.

### 3. Vocational Expert's Testimony

Vocational Expert ("VE") Ruth Baruch testified that Brown's previous work experience ranged from medium to very heavy exertion levels with skill levels ranging from unskilled to semi-skilled.  Id. at 58-59.  The ALJ asked the VE to answer questions based on a series of hypothetical situations.

First, the ALJ asked whether any of Brown's past work could be performed by an individual with Brown's age, education, and work experience who had the following residual functional

capacity ("RFC"): limited to light work, but rather than being able to walk for six hours a day, can only walk two hours a day and then can sit six hours a day, but would have to be allowed to sit and stand at will as long as he was not off task more than ten percent of the day; could only occasionally climb ramps and stairs, balance, kneel, crouch and crawl; had limited overhead reaching, handling, finger, and feeling with the non-dominant hand; and must avoid concentrated exposure to heat and cold, fumes, gases, dust, and odors.  Id. at 59.

The VE responded that such a person would be unable to perform Brown's past work because none of it was light, but that he could perform the following light, unskilled production jobs: a hand packager/inspector; bench hand work/ bench assembler work; and collator.  Id. at 60-61. Because Brown would need to sit and stand at will, he would be unable to perform thirty-five percent of the available hand packager/inspector and bench hand work/bench assembler jobs.  Additionally, because Brown would need to sit and stand at will, he would be unable to perform thirty percent of available collator jobs.  Id. at 60-61.

The ALJ then asked the VE whether jobs exist for an individual with the same RFC as initially described, except that the individual is limited to sedentary work.  Id. at 61-62.  The

VE testified that such an individual could do table work;[11] bench
hand work/bench assembler work; and order clerk work.  Id. at
62-63.

The ALJ next asked the VE to consider an individual who is
limited to sedentary, unskilled work and would need to take
three unscheduled breaks to relieve pain or discomfort, each
lasting ten minutes.  Id. at 63.  Based upon that hypothetical,
the VE ruled out all work and concluded that the individual's
restrictions would not be tolerated in the competitive labor
market.  Id.

**E.    The ALJ's Decision**

In her decision dated October 24, 2011, the ALJ followed
the five-step sequential evaluation process set forth at 20
C.F.R. 416.920(a) to determine whether an individual is
disabled.  Id. at 10-18.  At step one, the ALJ found that Brown
had not engaged in any substantial gainful activity since
September 22, 2009, the alleged onset date.  At step two, the
ALJ found that Brown has the following severe impairments:
degenerative joint disease of the hip, chronic obstructive
pulmonary disease, and carpal tunnel syndrome.  The ALJ also

---

[11]  A "table worker" "[e]xamines squares (tiles) of felt-based
linoleum material passing along on conveyor and replaces missing
and substandard tiles."  See Dep't of Labor, Dictionary of
Occupational Titles (4th ed. rev.1991), available at
http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT07D.HTM

concluded that Brown has the following non-severe impairments:
hypertension, restless leg syndrome, and sleep apnea.

At step three, the ALJ determined that Brown does not have
an impairment or combination of impairments that meets or
medically equals the severity of a listed impairments; that
Brown has the RFC to perform light work as defined by 20 C.F.R.
404.1567(b) except that Brown is limited to walking for only two
hours per day and can sit for six hours a day, but would need to
sit and stand at will, as long as he is not off-task for more
than ten percent of the day; and that Brown is limited to only
occasional climbing of ramps or stairs, balancing, kneeling,
crouching, and crawling.  The ALJ further concluded that Brown
has a limited ability to reach overhead or handle objects.  He
also must use his non-dominant hand as a helper hand.  Lastly,
the ALJ concluded that Brown must avoid concentrated exposure to
extreme cold, extreme heat, fumes, or gases.

At step four, the ALJ concluded that Brown would not be
able to perform any past relevant work.  Finally, at step five,
the ALJ noted that, considering Brown's age, education, work
experience, and RFC, there are jobs that exist in significant
numbers in the national economy that Brown could perform.  Thus,
the ALJ concluded that Brown was not disabled within the meaning

of the Social Security Act at any time from September 22, 2009, through October 24, 2011.

## II. <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).  It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.  The ALJ's findings of fact are accorded deference as long as they are supported by substantial evidence. Id.  Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Id.(quoting Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met,

21

factual findings are conclusive even if the record "arguably could support a different conclusion." Id. at 770. Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled. 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). In the context of a claim for social security benefits, disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). The applicant bears the burden, through the first four steps, of proving that his impairments preclude him from working. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step, the ALJ determines whether work that the claimant can do, despite his impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding. Seavey v. Barnhart, 276 F.3d 1, 10 n.5 (1st Cir. 2001).

### III. __ANALYSIS__

Brown moves to reverse or remand the ALJ's decision to deny his disability claim.  Brown makes a variety of arguments to support this motion, two of which require remand: first, he claims that the ALJ erred by failing to consider Brown's obesity in her opinion; and, second, he argues that the ALJ failed to give appropriate weight to Dr. Sharma's medical opinion regarding Brown's limited ability to lift weight.

### A.   __The ALJ's failure to consider Brown's obesity__

Brown argues that the ALJ failed to consider his obesity, as is required by Social Security Ruling 02-1p, which led to errors at step two and errors in the RFC determination.  SSR 02-1P, 2000 WL 628049 (Sept. 12, 2002).  I agree.

At the second step of the disability determination process, the ALJ determines the medical severity of a claimant's impairments.  20 C.F.R. § 416.920 (a)(4)(ii).  The ALJ must consider the combined effect of the applicant's impairments, regardless of whether any individual impairment, considered in isolation, is sufficient to support a finding of disability.  20 CFR 404.1523, see Bica v. Astrue, No. 11-CV-86-JD, 2011 WL 5593155, at *10 (D.N.H. Nov. 17, 2011).  Obesity is a medically determinable impairment, and the ALJ must evaluate its effect on a claimant's health both alone and in combination with other

medical problems.  20 C.F.R. Part 404, Subpart P, App. 1.  See
SSR 02-1P, 2000 WL 628049.

Here, the ALJ never addressed Brown's obesity in her
decision, despite the fact that numerous doctors noted Brown's
obesity; one physician commented on its impact on Brown's
ability to breathe; and another indicated that his obesity would
likely exacerbate his need for joint replacement surgery.  See
Tr. 245, 266, 270, 293, 298, 314, 326, 356, 377.  The Single
Decision Maker ("SDM") noted Brown's obesity, his doctors'
recommendation that he abide by a low-fat diet, and Brown's
elevated Body Mass Index,[12] but the ALJ did not consider these
factors.  Id. at 375.  Although an ALJ's findings of facts are
conclusive when they are based on substantial evidence, they
"are not conclusive when derived by ignoring evidence."  Nguyen
172 F.3d 31 at 35.

The ALJ's failure at step two to consider Brown's obesity
led to the ALJ's incomplete analysis between steps three and
four, when she determined Brown's RFC.  In assessing a claimant's
RFC, an ALJ must consider all of the claimant's medical
impairments.  SSR 96-8p, 1996 WL 374184, (July 2, 1996).  Thus,
in this case, the ALJ was required to consider the effect of

---

[12]  A person whose BMI is thirty or higher is considered obese.
Stedman's at APP 133.

Brown's obesity, if any, on his RFC.  Her failure to do so
merits remand for further consideration.

**B.    The ALJ's failure to give appropriate weight to Dr.
       Sharma's treating source opinion**

Brown also argues that the ALJ failed to give appropriate
weight to Dr. Sharma's treating source opinion.  Once again, I
agree.

A treating source's opinion of the nature and severity of a
claimant's impairments merits controlling weight if it "is well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in [the] case record...." 20 C.F.R. §
404.1527(c)(2); Coggon v. Barnhart, 354 F. Supp.2d 40, 52 (D.
Mass. 2005).  An ALJ must provide "good reasons" for discounting
the opinion of a treating physician.  20 C.F.R. 404.1527(c)(2).
For example, an ALJ may discount a treating source's opinion if
it is not well-supported by medically acceptable clinical and
laboratory diagnostic techniques or if record evidence
contradicts the treating physician's opinion.  20 C.F.R.
404.1527(c)(2).

In this case, Dr. Sharma opined that Brown could frequently
lift less than ten pounds and occasionally lift as much as ten
pounds.  According to Dr. Sharma, Brown is unable to lift more

than ten pounds either occasionally or frequently.  The ALJ nonetheless concluded that Brown is capable of doing light work[13] with additional nonexertional limitations.[14]  This conclusion is flatly inconsistent with Dr. Sharma's RFC analysis because light work requires a person to be able to occasionally lift up to twenty pounds.  See 20 C.F.R. 404.1567(b).

Here, the ALJ did not provide a "good reason" for discounting Dr. Sharma's opinion.  20 C.F.R. 404.1527 (c)(2); see Small v. Astrue, 840 F. Supp. 2d 458, 465 (D. Mass. 2012). In reaching her conclusion, the ALJ relied solely on the following excerpt from Brown's testimony:

---

[13]  Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. 404.1567(b).

[14]  The ALJ found that Brown: "has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that the claimant is limited to walking for only 2 hour [sic] per day and can sit for 6 hours a day, but would have to be allowed to sit and stand at will, as long as he is not off task for more than 10% of the day.  The claimant is limited to only occasional climbing of ramps and stairs, balancing, kneeling, crouching and crawling.  The claimant has limited overhead reaching, handling, fingering and feeling with the non-dominant hand as a helper hand.  Lastly the claimant cannot have any concentrated exposure to extreme cold and heat, fumes and gases."  Tr. 14.

26

```
Q [ALJ]: How much [weight] would you say that you can
lift frequently?
A [Brown]: No more than 10, 15 pounds anymore.
Q: Okay.
A: I beat myself up when I was a kid.
Q: Could you lift 20 pounds occasionally?
A: No, not really.
Q: Okay. So 10 to 15 would be the max?
A: Ten, yeah.
```

Tr. 36.  The ALJ identifies no other evidence to discount Dr.

Sharma's RFC analysis or to support her conclusion that Brown

can lift more than ten pounds.  Brown's testimony as to the

amount of weight he can lift is ambiguous at best and cannot

bear the weight the ALJ gives it.  I remand the case for further

consideration of Brown's RFC in light of the medical evidence.


## IV.  CONCLUSION

Pursuant to sentence four of 42 U.S.C. § 405(g), I remand

the case to the Social Security Administration for further

proceedings consistent with this decision.

SO ORDERED.

                              /s/Paul Barbadoro
                              Paul Barbadoro
                              United States District Judge

June 28, 2013

cc:  Janine Gawryl, Esq.
     E. David Plourde, Esq.